# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| CLEITUS ROSS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:22-cv-00455-LMC |
| | ) | |
| KANSAS CITY ROYALS BASEBALL | ) | |
| CLUB, LLC | ) | |
| | ) | |
| Defendant. | ) | |

## FIRST AMENDED COMPLAINT WITH JURY DEMAND

COMES NOW Plaintiff, Cleitus Ross ("Ross"), by and through his counsel of record, and hereby states his causes of action against Defendant, Kansas City Royals Baseball Club, LLC (the "Royals"), as follows:

1.     This is an action for race discrimination and hostile work environment.  Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, *et seq.* and 29 C.F.R. § 1614.101(a) and (b), and 42 U.S.C. § 1981.

## JURISDICTION AND VENUE

2.     Jurisdiction is proper in this Court, because federal questions are involved, pursuant to 28 U.S.C. § 1331.

3.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that employment practices alleged to be unlawful were committed within this judicial district.

## PARTIES

4.     Plaintiff Ross is an individual and a resident of Kansas.

5.     Defendant Royals is a Missouri limited liability company, in good standing and doing business within Jackson County, Missouri.

1

6. At all times relevant herein, Ross was an employee of Royals within the meaning of Title VII of the Civil Rights Act of 1964.

7. At all times relevant to the allegations in this Complaint, Royals was an employer within the meaning of Title VII of the Civil Rights Act of 1964.

8. At all times relevant to the allegations in this Complaint, all of Royals' officers and employees were acting within the scope of their employment

## ADMINISTRATIVE PROCEEDINGS

9. On or about August 23, 2021, Ross asserted a timely formal EEOC Complaint for race discrimination and hostile work environment.

10. Thereafter, Ross requested a Right to Sue letter from the EEOC.

11. On or about May 31, 2022, the EEOC issued to Ross a Notice of Right to Sue. which informed Ross of his right to sue within ninety (90) calendar days from his receipt of the Notice of Right to Sue.

12. This action has been timely commenced within ninety (90) days of Ross' receipt of his notice of right to sue, and he has otherwise met all conditions precedent to the filing of this Complaint.

## FACTS COMMON TO ALL COUNTS

13. In approximately January 2018, Ross came to the attention of Darwin Pennye ("Pennye"), who at that time, was the Executive Director of the Kansas City MLB Urban Youth Academy ("KCUYA") which is a division of the Royals.

14. Pennye approached Ross and raised the possibility of Ross taking a position with the KCUYA.

2

15.     Eventually Ross was offered and agreed to take the position of Coordinator, Baseball Programs at the KCUYA on or about April 2, 2018.

16.     Based upon Ross' personal experience with playing the game of baseball and coaching the game of baseball, Ross was uniquely qualified to fill this position and undertake the duties of the position.

*The KCUYA*

17.     The formation of the KCUYA and the construction of its facilities was for the purposes of targeting and giving underserved and minority youth opportunities not available to them.

18.     The KCUYA does not solely function upon revenues generated from the use of its facilities and it marketed itself toward attracting donors who provide funds to support its operations.

19.     At the time Ross was originally employed by the Royals, the KCUYA's official mission and vision statement provided that "The Kansas City MLB Urban Youth Academy is a non-profit organization with the mission to empower Kansas City's underserved youth ages 6-18 through baseball and softball, academic and social opportunities to be the leaders of tomorrow. The vision for the Academy is to become the epicenter for youth baseball and softball throughout the Midwest, beginning with the urban community and its location in the backyard of the historical 18th & Vine District."

*Ross' Employment*

20.     At the time Ross was offered and took the position as Coordinator, Baseball Programs at the KCUYA, he was also involved with Play Above Average, an organization that

3

came into existence in 2017 and was eventually formally organized as a Kansas limited liability company on October 31, 2019.

21.     At the time Ross was offered and took the position as Coordinator, Baseball Programs at the KCUYA, he was also involved with Kansas Reviving Baseball in Inner Cities ("Kansas RBI"), a charter of Major League Baseball's RBI Program.

22.     Ross has served as the Executive Director of Kansas RBI since its inception in 2010, a program run by the not-for-profit organization, Success Achieved in Future Environments ("S.A.F.E."), founded in 2007.

23.     The Royals and KCUYA were aware of Ross' involvement with Play Above Average and Kansas RBI when Ross was offered and took the position as Coordinator, Baseball Programs at the KCUYA.

24.     At the time when Ross was offered and took the position as Coordinator, Baseball Programs at the KCUYA, he was neither asked to nor required to execute any type of conflict of interest statement or waiver.

25.     At the time when Ross was offered and took the position as Coordinator, Baseball Programs at KCUYA, he was not asked to execute any type of non-competition agreement or any document indicating that Ross would not engage in any activities outside of Ross' employment for which he would receive compensation.

26.     At the time Ross was offered and took the position as Coordinator, Baseball Programs at the KCUYA, and at no time during Ross' employment, had Ross agreed to or had conversations pertaining to him stepping down from his role as Executive Director of Kansas RBI.

27.     At no time during Ross' employment did the KCUYA have any stated policy in place regarding conflicts of interest nor did the KCUYA require employees to execute non-

4

competition agreements or agreements where employees agreed that they would not earn compensation from other sources during their employment by the Royals.

28.     During Ross' employment, the Royals used Ross' image and video statements made by Ross to disseminate to the public to show that the KCUYA was earnestly attempting to fulfill its stated mission of providing assistance to "underserved" and minority youths.

29.     On October 21, 2018, a baseball team coached by Ross and Rich Devine ("Devine") known as Team KC-Ross won its first tournament held by the KCUYA.

30.     Following the victory by Team KC-Ross, Ross, Devine and parents of the players on Team KC-Ross noticed a racial animus being expressed against them by Kyle Vena ("Vena"), the now former Vice President of Community Impact of the Royals/KCUYA.

31.     Approximately in June and July 2019, Vena and Shon Plack ("Plack"), Manager - Sport Development/Baseball, held tryouts at KCUYA for Team KC teams while Pennye was out of town.

32,     In July 2019, Ross held a second tryout for Pennye to view the high-level urban core players not selected to be on a Team KC by Vena or Plack.

33.     Ross created two (2) teams, a 13U and a 14U, which consisted of urban core players for Team KC-STICKS that would represent the KCUYA.

34.     In Fall 2019, Vena removed the teams from under Pennye and Ross and put them under Plack's direction and informed them they would no longer be representing the KCUYA as STICKS teams and would just be known as Team KC.

35.     After one year, the two teams were disbanded.

36.     During April and May 2020, the entire KCUYA staff including Ross, met with Vena and Scott Helm ("Helm"), a nonprofit consultant brought on by Vena, spent time to create

5

the STICKS team program that would be presented to the KCUYA Board of Directors which would further provide opportunities to underserved and minority youth baseball players.

37.     Approval was given for the plan by the Board of Directors of the KCUYA.

38.     Thereafter, Ross contacted the marketing department of the KCUYA regarding preparation of a logo and uniform options, but received a delayed response.

39.     Ross subsequently learned that all of his efforts on this program were being blocked by Vena.

40.     The program approved by the Board of Directors for Urban Core players was never implemented due to Vena using his power to prevent it from happening.

41.     The program was ultimately changed, due to Vena's leadership efforts, to not target underserved or minority youth but, rather, to develop his own agenda of team programming that did not include youths from low socio-economic backgrounds but included children of the Royals' employees and Royals affiliated teams such as the Scout Team and Team KC that get primary use the KCUYA facilities.

42.     Some Royals employees or former players who have had or currently have children that play for the Scout team or Team KC and utilize the KCUYA facilities include Vena, Former Outfielder-Alex Gordon, President-Dayton Moore, General Manager-JJ Picollo, Hitting Coach-Alec Zumwalt, Director-Player Development/Field Coordinator-Mitch Maier, Sr. Director-Leadership & Cultural Development-Matt Marasco, Community Impact-Plack, Community Impact-Casey Boravac, Scout Team-Brett Bailey and Senior Director-Groundskeeping & Landscaping-Trevor Vance.

43.     On August 3, 2020 and August 4, 2020, the Walk-On World Series event was held at the KCUYA.

6

44.     Play Above Average partnered with KCUYA as the host site for the event.

45.     Pennye approved and participated in the partnership between Play Above Average and KCUYA and expressed no questions or concerns regarding the event.

46.     KCUYA received a donation as a result of the proceeds generated by this event.

47.     Later in August 2020, Plack informed Ross that Vena wanted Plack to tell Ross that if Ross wanted to continue with Team KC-Ross, the team would no longer be allowed to practice at the KCUYA facilities and that it would have to utilize another location for practices.

48.     Ultimately, Ross decided that the mission and purpose of the KCUYA was to serve underserved urban core youth players, which players on Team KC-Ross represented, so Ross continued to use the KCUYA facilities for practices and continued to do so during the winter of 2020 through 2021.

49.     No one followed up that Ross' team was not allowed to continue to use the KCUYA, instead Pennye along with Jeff Diskin ("Diskin"), Director, Professional & Community Development, changed the KCUYA schedule for Ross' time reserved from Team KC-Ross to Kansas RBI to avoid any backlash from Vena.

50.     In January 2021, a re-structure within the Royals and KCUYA was implemented which is now called Community Impact including the divisions:  KCUYA, Royals Charities, the Hall of Fame and the new Sports Development department.

51.     Prior to this re-structure, Pennye, an African American, had a staff of eight (8) full-time individuals who served under him with regard to KCUYA operations which consisted of three (3) African Americans, one (1) Hispanic and four (4) Caucasians.

52.     Following the restructure, Vena became the Vice President of Community Impact.

53.     Diskin was to report to Vena and in June 2021 received another promotion.

7

54.     Pennye and Plack were to report to Diskin.

55.     Because of the restructure, Pennye went from having eight (8) staff members serving under him to three (3):  (a) Ross, (b) Jill Seib Schaub ("Seib-Schaub"), Manager, Education Programs; and (c) Tia Sandoval ("Sandoval"), Coordinator, Education Programs.

56.     Although Seib-Schaub was to report to Pennye, her work location remained at Kauffman Stadium and not at the KCUYA facilities, leaving Pennye with just Ross and Sandoval as his staff.

57.     Two (2) African American mission driven employees, Angel McGee ("McGee") and Ashley Newman ("Newman"), who previously worked out of the KCUYA's facilities were moved out of the KCUYA's facilities and placed at Kauffman Stadium.

58.     The new Sports Development Department was placed at the KCUYA and consisted of four (4) Caucasian employees focusing on utilizing the facility for use other than the intended mission leaving Pennye with only (2) full-time staff to lead KCUYA programming.

59.     The KCUYA was also made the full-time home for the Royals Scout Team and Team KC.

60.     Upon information and belief, the restructuring was at the behest of Vena and aligned with his plan to transition KCUYA away from its mission of providing underserved youth with the opportunities that the KCUYA provided.

61.     On February 21, 2021, Pennye had a meeting with Ross.

62.     During this meeting, Ross was handed a personalized "conflict of interest" form that he was asked to sign and return.

63.     Pennye expressed to Ross that he slept on it for three (3) days and it was something that he did not want to do.

8

64.     Upon information and belief, prior to this time, no other employee of the Royals involved with the KCUYA or from other departments within the Royals, was ever asked to execute such a form.

65.     Ross refused to execute the form because he believed he was being discriminated against on the basis of his race and the presentation of the form to him was part of a racially hostile working environment that was being developed after the re-structure occurred in January 2021.

66.     On March 26, 2021, prior to a meeting with Vena, Pennye sent Ross a text message inquiring as to whether it was Ross' intention to continue to give private lessons to youth players.

67.     This was the first time since February 21, 2021, that Pennye had made any reference to any type of conflict of interest that the Royals believed Ross had adversely impacted Ross' employment with the Royals.

68.     Ross responded by sending Pennye an email attaching a scanned copy of the conflict of interest form Ross had been asked to sign and Ross asked specific questions as to why he was being singled out for this type of treatment.

69.     Pennye never responded to Ross' email.

70.     Prior to March 2021, the Elite Development League ("EDL") was being set up in partnership with Kansas RBI and the KCUYA, to host a youth league at the KCUYA that was approved by Pennye and added to the KCUYA schedule in November 2020, as the "KCUYA Youth Development League".

71.     However, once Vena and Miriam Maiden ("Maiden"), the Royal's Director of Human Resources, started their investigation in April 2021, they quickly changed and continuously referred to it as Ross' personal league due to the fact of how players registered, which was through Kansas RBI.

72.     Events partnering with the KCUYA and utilizing the facility are not required to have registration go through the KCUYA system.

73.     The primary reason for Ross wanting players to register via the Kansas RBI registration system was to make sure they signed waivers that included COVID-19 which would protect both Kansas RBI and the KCUYA.

74.     From a previous experience in June 2018, where Kansas RBI partnered with Royals Charities for an event at Kauffman Stadium, a player got hurt and Royals Charities did not have a signed waiver but was protected by a signed Kansas RBI waiver the player had signed.

75.     Based upon this experience, Ross felt it was necessary to always have players sign waivers for all partnership events.

76.     The only staff who had an issue with the partnership was Vena and Maiden.

77.     In addition, Ross wanted to make sure all coaches were paid the same way in an effort to make sure the Royals got paid in full for the league participation and use of the facility.

78.     Ross' job description and responsibilities stated: "Maintain a working relationship and programming with all local RBI, High School and College Baseball Programs" which the EDL helped fulfilled.

79.     On March 30, 2021, three (3) hours before the first pitch of the EDL, Ross was informed by Pennye that it had been cancelled.

80.     Ross subsequently learned that Vena had told Pennye to cancel the EDL several months before March 30, 2021 and that Pennye had disagreed and would not cancel it.

81.     Although the games scheduled for the Tuesday and Wednesday of that week were able to proceed, the rest of the games scheduled for the EDL were cancelled.

10

82. On March 30, 2021, after finding out that the EDL had been cancelled, Devine met with Pennye in Pennye's office at the KCUYA.

83. During Devine's meeting with Pennye, Pennye told Devine the following:

    a.    That Vena had approached Maiden regarding the issues being presented with EDL's and Play Above Average's use of the KCUYA facilities. Ross believes that this indicated that Vena had been planning on working towards the termination of Ross' employment even before this date.

    b.    Vena and Maiden worked as the Royals' front office executives as well as sit on the Board of Directors of the KCUYA. This could be viewed as creating a conflict of interest between the two.

    i)    Pennye stated there was an email from Vena and Maiden he believes indicated that they were leveraging their Board positions by stating the Board of Directors were in agreement and the EDL did not need to happen and had to be removed from the schedule.

    ii)    It is unclear why the KCUYA Board, consisting of Moore, Vena, Maiden, Sly James, Carolyn Watley, Leo Morton and Carlos Casas, would cancel a league created in partnership between the KCUYA and Kansas RBI, a supposed priority partnership promoted via Royals community communications and publications and by Sarah Tourville ("Tourville"), the Senior Vice President/Chief Revenue and Innovation Officer of the Royals, in email communication.

    iii)    Ross believes this was done to promote Vena's discriminatory views and another step towards the termination of Ross' employment.

c. That Vena had already made up his mind to terminate Ross' employment and had gotten Maiden involved with the situation so Pennye felt like there was nothing he could do to preserve Ross employment and that they were going to make it look like, there was something done under the table.

d. That Ross had been nothing but professional throughout Ross' employment and indicated that Pennye felt that if he thought what was going on with the Royals' Front Office manipulation of Ross' employment, that his employment would be terminated as well.

e. That Pennye had told Maiden he thought what her and Vena were doing to Ross was unprofessional and that he would not have any further conversations with her.

f. That Pennye stated he was responsible for what happens at the KCUYA until he does not agree with Maiden or Vena who then leveraged their positions to say what was going to be done so at that point there was nothing Pennye could do.

g. That due to the position of power Vena had been put in, he was untouchable and could do whatever he liked.

h. Vena knew he was supported if Dayton Moore ("Moore") got involved because Moore was known for wanting to make problems go away instead of resolving them which was displayed in response to a previous employment discrimination case brought against the Royals.

i. That Pennye did not believe that Ross had engaged in any financial malfeasance or misfeasance with regard to payment for use of the KCUYA facilities.

j. Devine asked Pennye whether Vena wanted people like Devine using KCUYA facilities and Pennye told him no.

12

k.     Pennye specifically told Devine that KCUYA was getting farther and farther away from its mission.  Pennye told Devine that Moore wanted to get all types of kids to use the facilities of the KCUYA.

l.     Pennye told Devine that if Royals owner John Sherman ("Sherman") asked him one thing that he wanted to do at the KCUYA, Pennye would respond that he would request "Urban" be removed from the name of KCUYA.

84.     On Friday April 2, 2021, Good Friday, a holiday, Vena and Maiden arrived at the KCUYA without any advanced notice to speak with Ross, who had not planned to be at the KCUYA due to the Royals' employees having this day off but had decided to assist with an event Pennye had scheduled not realizing it was holiday and made a point of making sure that all employees who were present were aware that Ross would be meeting with them.

85.     Vena and Maiden asked Ross about his involvement with KCUYA, Kansas RBI and Play Above Average and informed him the purpose of the meeting was for clarification.

86.     Due to Ross' embarrassment, humiliation and anxiety caused by this meeting and the way it was conducted, he worked the remainder of the day outside of the office until the staff who were present left.

87.     On Monday, April 5, 2021, Ross sent an email to Maiden similar to the email he had sent to Pennye on or about March 26, 2021 inquiring about the conflict of interest form and expressing his belief that he was suffering from a hostile work environment.

88.     Ross sent the email to Maiden because he wanted to discuss this issue as during the meeting on April 2, 2021, he chose not to do so because of Vena's presence and his position of authority within the KCUYA and the Royals.

89.     Ross never received a response to the email he sent to Maiden on April 5, 2021.

90.     On Monday, April 12, 2021, Vena and Maiden again arrived at the KCUYA facilities with the sole purpose to speak with Ross without giving prior notice to Ross.

91.     Ross was advised during the April 12, 2021 meeting, that he was being placed on paid suspension because there was an active investigation against Ross regarding possible conflicts of interest because of his involvement with KCUYA, Kansas RBI and Play Above Average.

92.     During this meeting, Ross' laptop and his key to the facility were confiscated and Ross was told not to report to work or return to the KCUYA until a final decision had been made within a week's time.

93.     On April 13, 2021, Maiden sent Sandoval an email requesting a meeting at Kaufmann Stadium at 12:30 p.m. that day.

94.     When Sandoval arrived at the meeting, both Maiden and Vena were present.

95.     Sandoval was asked about her personal relationship with Ross and her knowledge of Ross' involvement with Kansas RBI and Play Above Average.

96.     Sandoval was surprised by these questions because no issue regarding any conflict of interest had ever been raised before to her knowledge.

97.     Sandoval was informed at that time that she was being placed on paid suspension until an investigation could be completed and Sandoval's laptop and key to the KCUYA were confiscated.

98.     Following these developments, both Ross and Sandoval attempted to provide information regarding the hostile work environment and discriminatory motives that were being expressed through Vena's acts to Tourville and other individuals in power positions within the Royals and these attempts were rebuffed.  Tourville turned a blind eye to the hostile work

14

environment and discriminatory motives and became an active member of the front office manipulation by giving Vena the platform and power to fulfill his racist agenda.

99. Tourville indicated Maiden would remain involved as she had the expertise needed, but that Vena would be removed from future meetings.

100. No future meetings occurred, and the next time Ross met with Maiden and Tourville was April 22, 2021, when Ross' employment with the KCUYA was terminated and Sandoval's employment was reinstated.

101. During Ross' employment by the Royals, he was never disciplined and had no issues with Pennye, his direct supervisor.

102. Issues only arose with Ross' employment when Vena assumed the leadership position at the KCUYA, and Vena partnered with Maiden to investigate Ross. Vena and Maiden both worked at Kauffman Stadium and spent minimal to no time at the KCUYA around Ross.

103. On April 27, 2021, Vena, Maiden and Tourville hosted a Community Impact Department meeting via zoom where all eighteen (18) Community Impact employees were present, and the sole purpose of this meeting was to discuss the termination of Ross' employment.

104. The employees were told that Ross' termination was a necessity and was based upon their investigation.

105. The employees were told that if anyone from Team KC-Ross wanted to discuss anything with them about Ross or EDL, they were to be instructed to contact Maiden and Tourville.

106. The reasons provided by the Royals for Ross' termination were pretextual.

107. The real reason for Ross' termination was because of his race and the fact that Vena knew Ross would fight the redirection of the use of the KCUYA facilities that Vena wanted to occur.

15

108.    While Ross was employed by the Royals, approximately one (1) week after he was placed on paid suspension, the Royals removed the term "underserved" from the KCUYA's website.

109.    The removal of the term "underserved" from the mission statement of the KCUYA on its website was not publicly shared and staff of the KCUYA did not receive any communication that the mission of the KCUYA had been changed.

110.    The term "underserved" as used by the KCUYA, specifically referred to minority youths and tied to the name of the KCUYA.

111.    Ross engaged in no financial improprieties regarding the EDL event and its creation was in line with his job responsibilities.

112.    Ross created leagues and programming according to his job description throughout his employment with the KCUYA and the Royals.

113.    Other non-minority, non-protected individuals employed by the Royals have engaged in transactions between the Royals and other organizations but have not been accused of engaging in behavior that constitutes a conflict of interest and they have not been asked to sign conflict of interest forms.  These individuals include:

a.    Vena

(i)    Vena serves on the Board of the KCUYA, is the former Vice-President of Royals Community Impact, is the Chairman of Royals Charities.  For some unknown reason on the issues regarding Ross' employment, Vena became directly involved in Human Resources decisions made within the KCUYA.

(ii)    Vena and his wife, Kasey, were owners of Create360, a Kansas limited liability company that was established in 2017, which received $64,800

16

from the Royals in 2018 as payment to Kasey for consultation service as a Kansas limited liability company that was established in 2017, received $64,800 from the Royals in 2018 as payment to Kasey for consultation services.

(iii)    Vena was the part of a leadership team that hired Kasey (who stopped working for the Royals in 2019) and their entity, Create360, was dissolved in 2020.

b.    Casey Borovac ("Borovac"), Manager, Sport Development/Softball

(i)    Borovac works and receives compensation from both the Royals and USA Softball Kansas City.

(ii)    Borovac does work for both KCUYA and USA Softball Kansas City while being on the clock and paid to work by the KCUYA. She has meetings, takes phone calls, plans events and tournaments for both KCUYA and USA Softball while at the KCUYA whether the events are to be held utilizing the KCUYA facilities or not.

(iii)    Borovac works and is listed as a Board member of Blue Springs Girls Softball League/Blue Springs Softball Association.

(iv)    Borovac's daughter's softball team, an all-white team, gets the most access to KCUYA facilities (outside of UMKC) and was the only team that was allowed to practice at the KCUYA's indoor facilities during the winter of 2020 to 2021.

c.    Dylan Wilson ("Wilson"), Manager, Sport Development/Sports Medicine

17

       (i)       When an event is held at KCUYA requiring an athletic trainer, he is able to act as a trainer.

       (ii)      Wilson receives additional compensation that is separately and directly paid to him by the host of any event not the KCUYA or by the Royals when he acts as a trainer from the parties that rent the KCUYA facility.

d.    Jeff Diskin ("Diskin"), Director, Professional and community Development

       (i)       Diskin has worked for the Royals and has also been the coach of the Pembroke Hill High School Baseball Team since the early 2000s.

       (ii)      Upon information and belief, Diskin receives compensation for acting as the coach of the Pembroke Hill High School Baseball Team.

e.    Chuck Hawke ("Hawke") Senior Director, Clubhouse Operations. Hawke works for both the Royals and is also the State Commissioner for USA Softball Kansas City.

f.    Plack, Manager – Sport Development/Baseball. Plack works for the Royals and was previously a KC Scout Team Coach at the same time he worked and received compensation from Prep Baseball Report as their Kansas Scouting Director.

g.    Brett Bailey ("Bailey"), Royals Scout Team Coach.

       (i)       Bailey receives compensation from the Royals.

       (ii)      Bailey provides private lessons at Competitive Edge and is the Assistant Baseball Coach for the Pembroke Hill High School Baseball Team.

       (iii)     Upon information and belief, Bailey receives compensation in these roles.

114.    The racial makeup of Royals' employees is disproportionally non-minority based and no African American holds an Executive or Front Office position within the Royals. Seventy-

Five years ago, Jackie Robinson broke the color barrier in Major League Baseball and the number of African Americans participating in the game of baseball is lower now than it was 50 years ago. Ross feels a major reason for that is teams like the Royals who raise millions of dollars claiming they want to help underserved youth by building a facility for them in public, but then has leaders like, Vena, who promote racial discrimination regarding use of the facility.

115.     As of July 2022, the nine (9) staff members who worked for the KCUYA before the re-structure all no longer play an active role in the KCUYA.

a.     Ross, McGee and Sandoval are no longer employed by the Royals.

b.     Pennye transitioned out of the Executive Director role at the KCUYA and is now a Special Assignment Scout which allowed him to no longer have to report to Vena.

c.     Newman, Wilson, Borovac, Johnathan Rosa and Chris Major are now in different Community Impact departments.

d.     Maiden is no longer employed by the Royals. We have reason to believe that the situation involving Ross played a key role in her leaving the employment of the Royals and joining the Portland Trailblazers of the National Basketball Association.

116.     Following Ross' termination, he has been contacted by individuals and told that key Royals' employees have stated that Ross was terminated because of reasons other than those the Royals indicated for Ross' termination.

117.     The Royals' public statements regarding the reasons for Ross' termination have resulted in Ross suffering a great amount of anxiety and emotional distress.

118.     Following Ross' termination in July 2021, Team KC Ross' coaching staff emailed Plack, Pennye, Diskin, Vena and Moore to inquire when the next year's tryouts would occur, but received no response.

119.     Subsequently, an all non-minority based team that played baseball on a lower level was brought on as Team KC to replace Team KC Ross, the most diverse and successful team playing as a Team KC comprised of nine (9) African Americans, two (2) Hispanics and three (3) Caucasian players that had been nationally ranked since the age of 8.

120.     Team KC Ross' parents were concerned that no communication had been received from the KCUYA or the Royals and reached out to KCUYA Board Member, Sly James ("James") who indicated he would personally look into the matter and that the team would hear back from him.

121.     Subsequently, James indicated that he could not elaborate on what was occurring due to an employment matter, but the Royals would reach out to the team within a week.

122.     Parents further questioned what an employee matter had to do with 11-12 year olds being able to play under a name and at a facility that was supposedly built for youth like them and James indicated the matters should be separate and that he would reach back out regarding the issue.

123.     Instead of the team hearing back from James, the KCUYA, or the Royals, only the three (3) Caucasian players received information about Team KC and were placed on the new Team KC while the minority players, who did not receive any type of communication or information, were forced to find new teams.

## COUNT I

## TITLE VII – DISCRIMINATION BASED ON RACE

COMES NOW Ross and for Count I of his Complaint against the Royals for Discrimination Based on Race, states and alleges as follows:

124.     Ross incorporates, by reference, the allegations set forth in the preceding paragraphs as if fully set forth herein.

125.     Ross is an African American male, was and is a member of a protected group under Title VII of the Civil Rights Act of 1964.

126.     During the course of Ross' employment with the Royals, Ross was subjected to intentional discrimination against him (hereinafter "unlawful conduct"), based on his race, in violation of Title VII of the Civil Rights Act of 1964.

127.     Ross' race played a role in the termination of his employment by the Royals.

128.     The unlawful conduct as described herein would have offended a reasonable person of the same race in Ross' position.

129.     Senior management of the Royals knew, or should have known, of the race discrimination against Ross described herein, but failed to take appropriate remedial action.

130.     By failing to conduct an honest investigation of Ross' alleged acts or omissions prior to his termination by the Royals, the Royals exacerbated the race discrimination being perpetrated against Ross.

131.     The Royals failed to make good faith efforts to enforce policies to prevent unlawful race discrimination against its employees, including Ross.

132.     The Royals failed to properly train or otherwise adequately inform their supervisors, officers and employees concerning the duties and obligations under civil rights laws, including Title VII of the Civil Rights Act of 1964.

133.     As a result of the Royals' unlawful conduct and Ross' unlawful termination, Ross has been deprived of and will continue to suffer economic and non-economic damages.

134.     As a further direct and proximate result of the Royals' actions, Ross has suffered mental anguish, emotional pain, suffering and distress, embarrassment, humiliation, inconvenience, loss of enjoyment of life and related compensatory damages as alleged above.

135.     As pled in the foregoing, the Royals engaged in unlawful conduct and discriminated against Ross on the basis of his race with malice or reckless indifference to the federally protected rights of Ross.

136.     Ross is therefore entitled to an award of punitive damages in an amount sufficient to punish the Royals or deter the Royals and other similarly situated employers from like conduct in the future.

137.     Ross is entitled to recover from the Royals Ross' reasonable attorney's fees and costs as provided for under Title VII of the Civil Rights Act of 1964.

WHEREFORE, Ross prays for judgment against the Royals on Count I of this Complaint; for a finding that Ross was wrongfully terminated based upon Race in violation of Title VII of the Civil Rights Act of 1964; for an award of economic, compensatory and punitive damages; equitable relief; for Ross' costs expended; for Ross' reasonable attorney's fees, costs and expenses; and for such other and further relief as the Court deems just and proper.

## COUNT II

## TITLE VII – RACIALLY HOSTILE WORK ENVIRONMENT AND DISCRIMINATION BASED ON RACE

COMES NOW Ross and for Count II of his Complaint against the Royals for Racially Hostile Work Environment and Discrimination Based on Race states and alleges as follows:

138.     Ross incorporates, by reference, the allegations set forth in the preceding paragraphs as if fully set forth herein.

139.     Ross is an African American male, was and is a member of a protected group under Title VII of the Civil Rights Act of 1964.

140.     During the course of Ross' employment with the Royals, Ross was subjected to intentional discrimination against him (hereinafter "unlawful conduct"), based on his race, in violation of Title VII of the Civil Rights Act of 1964.

141.     As pled in the foregoing, Ross was subjected to a hostile work environment based upon his race, in violation of Title VII of the Civil Rights Act of 1964.

142.     The unlawful conduct as pled in this Complaint created a racially hostile work environment.

143.     The unlawful conduct as described above had the purpose and effect of unreasonably interfering with Ross' work performance, thereby, creating an intimidating, hostile and offensive working environment.

144.     The unlawful conduct as described herein would have offended a reasonable person of the same race in Ross' position.

145.     Senior management of the Royals knew, or should have known, of the race discrimination against Ross described herein, but failed to take appropriate remedial action.

146.     By failing to conduct an honest investigation of Ross' alleged acts or omissions prior to his termination by the Royals, the Royals exacerbated the race discrimination being perpetrated against Ross and exacerbated the hostile work environment being suffered by Ross.

147.     The Royals failed to make good faith efforts to enforce policies to prevent unlawful race discrimination against its employees, including Ross.

148.    The Royals failed to properly train or otherwise adequately inform their supervisors, officers and employees concerning the duties and obligations under civil rights laws, including Title VII of the Civil Rights Act of 1964.

149.    Because of its actions and inactions, the Royals deliberately rendered Ross' working conditions intolerable through the actions and inactions of its officers and employees.

150.    As a result of the Royals' unlawful conduct and Ross' racially hostile work environment, Ross has been deprived of and will continue to suffer economic and non-economic damages.

151.    As a further direct and proximate result of the Royals' actions, Ross has suffered mental anguish, emotional pain, suffering and distress, embarrassment, humiliation, inconvenience, loss of enjoyment of life and related compensatory damages as alleged above.

152.    As pled in the foregoing, the Royals engaged in unlawful conduct and discriminated against Ross and created a racially hostile work environment on the basis of his race with malice or reckless indifference to the federally protected rights of Ross.

153.    Ross is, therefore, entitled to an award of punitive damages in an amount sufficient to punish the Royals or deter the Royals and other similarly situated employers from like conduct in the future.

154.    Ross is entitled to recover from the Royals, Ross' reasonable attorney's fees and costs as provided for under Title VII of the Civil Rights Act of 1964.

WHEREFORE, Ross prays for judgment against the Royals on Count I of this Complaint; for a finding that Ross was wrongfully terminated based upon Race in violation of Title VII of the Civil Rights Act of 1964; for an award of economic, compensatory and punitive damages;

equitable relief; for Ross' costs expended; for Ross' reasonable attorney's fees, costs and expenses; and for such other and further relief as the Court deems just and proper.

## COUNT III

### 42 U.S.C. § 1981 – DISCRIMINATION BASED ON RACE

COMES NOW Ross and for Count III of his Complaint against the Royals for Discrimination Based on Race, states and alleges as follows:

124.     Ross incorporates, by reference, the allegations set forth in the preceding paragraphs as if fully set forth herein.

125.     Ross is an African American male, was and is a member of a protected group under 42 U.S.C. § 1981..

126.     During the course of Ross' employment with the Royals, Ross was subjected to intentional discrimination against him (hereinafter "unlawful conduct"), based on his race, eventually ending up with the termination of his employment by the Royals in violation of 42 U.S.C. § 1981..

127.     But for Ross' race, which is African American, the Royals would not have terminated his employment.

128.     Because of the actions of the Royals, Ross did not enjoy the same right to make contracts as enjoyed by white citizens with regard to his employment in violation of 42 U.S.C. § 1981.

129.     The Royals intentionally discriminated against Ross because of his race when the Royals terminated Ross' employment and but for his race he would not have been terminated in violation of 42 U.S.C.§ 1981.

25

129.    The unlawful conduct as described herein would have offended a reasonable person of the same race in Ross' position.

130.    Senior management of the Royals knew, or should have known, of the race discrimination against Ross described herein, but failed to take appropriate remedial action.

130.    By failing to conduct an honest investigation of Ross' alleged acts or omissions prior to his termination by the Royals, the Royals exacerbated the race discrimination being perpetrated against Ross and but for his race he would not have been terminated by the Royals.

131.    The Royals failed to make good faith efforts to enforce policies to prevent unlawful race discrimination against its employees, including Ross.

132.    The Royals failed to properly train or otherwise adequately inform their supervisors, officers and employees concerning the duties and obligations under civil rights laws, including 42 U.S.C. § 1981..

133.    As a result of the Royals' unlawful conduct and Ross' unlawful termination because of his race, Ross has been deprived of and will continue to suffer economic and non-economic damages.

134.    As a further direct and proximate result of the Royals' actions, Ross has suffered mental anguish, emotional pain, suffering and distress, embarrassment, humiliation, inconvenience, loss of enjoyment of life and related compensatory damages as alleged above.

135.    As pled in the foregoing, the Royals engaged in unlawful conduct and discriminated against Ross on the basis of his race with malice or reckless indifference to the federally protected rights of Ross.

136.     Ross is therefore entitled to an award of punitive damages in an amount sufficient to punish the Royals or deter the Royals and other similarly situated employers from like conduct in the future.

WHEREFORE, Ross prays for judgment against the Royals on Count III of this Complaint; for a finding that Ross was wrongfully terminated based upon Race in violation of 42 U.S.C. § 1981; for an award of economic, compensatory and punitive damages; equitable relief; for Ross' costs expended; for Ross' reasonable attorney's fees, costs and expenses; and for such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Ross demands a jury trial on all issues so triable in this action.

Respectfully Submitted,

VAN OSDOL, PC

By:   s/ Anthony L. Gosserand
     Anthony L. Gosserand  MO#38844
     1600 Genessee Street, Suite 246
     Kansas City, Missouri    64106
     Telephone:     (816) 421-0644
     Telecopier:     (816) 421-0758
     tgosserand@VanOsdolKC.com

     ATTORNEYS FOR PLANTIFF CLEITUS ROSS

27

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on the 22nd day of February, 2023, a true and correct copy of the foregoing was filed electronically with the United States District Court for the Western District of Missouri using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

/s/ Anthony L. Gosserand
Attorney for Plaintiff